UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT STEVEN HUDSON | No. C 08-1357 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| BEN CURRY, warden, | |
| Respondent. | |

## INTRODUCTION

Robert Steven Hudson, an inmate at the Correctional Training Facility in Soledad, filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the *pro se* habeas petition. For the reasons discussed below, the petition is denied.

## BACKGROUND

Hudson pled guilty and was convicted of first degree murder in the Los Angeles Superior Court pursuant to a plea agreement that resulted in the special circumstances and robbery allegations being dismissed. *See* Resp. Exh. 3 at Exh. G, p. 226. Hudson was sentenced in 1984 to serve 25 years to life in prison. Hudson's minimum eligible parole date was July 17, 1999. His habeas petition challenges a December 15, 2005 decision by the Board of Parole Hearings ("BPH") that found Hudson not suitable for parole. As of the date of the challenged decision, petitioner had served about 21 years of his sentence.

The BPH identified the circumstances of the commitment offense, Hudson's unstable social history, and Hudson's prior criminality as the reasons for the decision that Hudson's release would pose an unreasonable risk of danger to society.

Hudson sought relief in the California courts. The Los Angeles County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal and California Supreme Court denied his petitions for writ of habeas corpus.

Hudson then filed his federal petition for a writ of habeas corpus, and alleged two claims. First, Hudson alleged that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole. Second, he alleged that his right to due process was violated because the BPH violated his plea agreement. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and Hudson filed a traverse.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Williams (Terry) v. Taylor*, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. *See Hayward v. Marshall*, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.  <u>Claim Of Insufficient Evidence To Deny Parole</u>

    1.  <u>State Law Standards For Parole For Murderers In California</u>

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. *See In re Dannenberg*, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall

3

set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). The listed circumstances tending to show *unsuitability* for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). The listed circumstances tending to show *suitability* for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, the presence of battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d). A parole date set under this article "shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. *See* 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base

4

1  terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on
2  some of the facts of the crime. The statutory scheme places individual suitability for parole
3  above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.
4  *Dannenberg*, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until
5  the prisoner is found suitable for parole. *Id.* at 1070-71; 15 Cal. Code Regs. § 2403(a).

6  The "Penal Code and corresponding regulations establish that the fundamental
7  consideration in parole decisions is public safety . . . [T]he core determination of 'public safety'
8  under the statute and corresponding regulations involves an assessment of an inmate's *current*
9  dangerousness." *In re Lawrence*, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in source).
10 Where "evidence of the inmate's rehabilitation and suitability for parole under the governing
11 statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity
12 of the commitment offense, and that offense is both temporally remote and mitigated by
13 circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the
14 commitment offense involved aggravated conduct does not provide 'some evidence'
15 *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." *Id.*
16 at 1191 (emphasis in source).

17
18         2.     Federal Habeas Relief On Parole Denial Claims

19 The U. S. Constitution's Due Process Clause does not itself provide state prisoners with
20 a federal right to release on parole. *Hayward v. Marshall*, 603 F.3d 546, 562 (9th Cir. 2010) (en
21 banc). The substantive law of a state might create a right to release on parole, however. *See id.*
22 at 555, 559. Although *Hayward* purported not to reach the question whether a California's
23 substantive law created a federally protected liberty interest, *see id.* at 562, later cases from the
24 Ninth Circuit have said or assumed it does. *See Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir.
25 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter
26 of federal law. . . . By holding that a federal habeas court may review the reasonableness of the
27 state court's application of the California 'some evidence' rule, *Hayward* necessarily held that
28 compliance with the state requirement is mandated by federal law, specifically the Due Process

5

Clause." ); *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In *Hayward*, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); *id.* ("we must examine the nature and scope of the federally enforceable liberty interest created by California's 'some evidence' requirement"); *see also Pirtle v. California Board of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.' *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some evidence' of current dangerousness. *Hayward* [603 F.3d at 562-63.]") *Hayward*'s application and these later cases make it clear that in the Ninth Circuit there is federal habeas relief available under § 2254 for California prisoners denied parole without sufficient evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)). That requirement was summarized in *Hayward* as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶] Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

*Hayward*, 603 F.3d at 562 (footnotes omitted) (quoting *Lawrence*, 44 Cal. 4th. at 1210, 1213-14); *see also Cooke*, 606 F.3d at 1216 (describing California's "some evidence" requirement).

When a federal court considers a habeas petition directed at a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2)

6

for whether the decision was "based on an unreasonable determination of the facts in light of the evidence." *Cooke*, 606 F.3d at 1214 (citing *Hayward*, 603 F.3d at 563).

### 3. Hudson's Case

#### a. His Circumstances

Commitment offense: The transcript from the challenged parole suitability determination describes the crime as follows. Twenty-eight-year-old Hudson and the victim, Duane Keith Rice, were involved in dealing narcotics together for approximately six years. Business dealings between Hudson and Rice had soured, and Hudson developed animosity toward Rice. Both Hudson's wife and his friend, Patrick Dickey, convinced Hudson to rob Rice for money. Rice was known to typically carry large sums of money on his person for his narcotics business. For over a month, Hudson and Dickey devised a plan to assault and rob Rice. (Hudson maintains that the original plan was not to murder Rice, only to rob and assault him.) On February 28, 1983, Hudson and Dickey proceeded to rob Rice as planned. When Rice attempted to defend himself, a struggle ensued. Hudson and Dickey repeatedly struck Rice with a metal pipe, splitting Rice's head open and killing him. Hudson and Dickey wrapped Rice's body in plastic and put the body into Rice's van. After cleaning the crime scene, Hudson and Dickey went to an all-night sporting goods store on the way to Las Vegas and purchased a rubber raft and lead weights. Hudson and Dickey rowed into the middle of Lake Mead, weighted the body down with weights, and tossed the body into the water. Rice's body has never been recovered. The van was abandoned in Mexico. *See* Resp. Exh. 1 at Exh. A, 12/15/05 BPH hearing reporter's transcript ("RT") 11-13; Resp. Exh. 1 at Exh. C, 12/31/02 mental health evaluation, ¶. 4-5.

Pre-Commitment Criminality: Hudson was arrested on five occasions before his conviction. RT 62. The first arrest occurred in 1973 for possession of marijuana and resulted in Hudson being placed in a drug diversion program which he completed successfully. RT 15. The second arrest occurred in 1974 for possession of a controlled substance and for obstructing or resisting a public officer. RT 62. The third arrest occurred in 1975 for possession of marijuana and hashish. *Id*. The fourth arrest occurred in 1976 for possession of concentrated

cannabis. *Id*. The fifth arrest also occurred in 1976 for possession of marijuana, hashish, and concentrated cannabis. *Id*. None of the arrests resulted in convictions. *Id*. at 62-63. Hudson admitted to a psychologist that he had been involved in the drug business:

> Inmate Hudson described the circumstances of his commitment offense. He told about a period of ten years, from the beginning of his use of marijuana and hashish at age 18 until his commitment offense at age 28, during which he began with the values of the hippie culture, according to which selling cannabis was a mild black market offense (perhaps similar to bootlegging during prohibition), and how this evolved over the years to a point where he developed criminal values and thinking as he developed a larger and larger business, such as smuggling cocaine from South America and setting up a marijuana farm in the California desert.

Resp. Exh. 1 at Exh. C, 12/31/02 mental health evaluation, p. 4-5.

<u>In-Custody Behavior</u>: Hudson had no serious disciplinary actions in prison. He received one CDC-128 counseling chrono for misappropriation of state food, i.e., several pounds of honey and sugar, which a commissioner suspected were for wine-making purposes. RT 52, 59. In addition, Hudson was suspended from a hobby craft for six months for inappropriately keeping his hobby materials in his cell. RT 52-56.

<u>In-Custody Accomplishments</u>: Hudson's in-custody accomplishments were numerous. Hudson completed a 28-course FEMA course in emergency management, a vocational training program in Information Technology, and he participated in a Vocational Drafting Program until the program was cancelled. RT 36, 39. Hudson earned his A.A. from Hartnell College while in prison and he needed only 30 upper division units to complete his Bachelor's Degree at Purdue University. RT 36-37. In prison, Hudson has held jobs as a dining room worker, a recreation yard worker, a clerk in Accounting Services, and a purchaser for the Education Department. RT 40. He received satisfactory to above average scores in each job. RT 42. Hudson has also completed numerous courses, including Life Skills, One-on-One, Alternatives to Violence, Anger Management, Family Effectiveness, and Impact Life Skills. RT 44-45. He was a long time participant in Alcoholics Anonymous and Narcotics Anonymous programs. RT 43-44. Hudson volunteered with the prison's Alcoholics Anonymous program, the Children's Holiday Festival, and as a bass player for Arts in Corrections. RT 48.

<u>Parole Plans</u>: Hudson had realistic parole plans. Hudson's parents informed the parole board that they were ready to provide Hudson with room, board, and transportation upon release.

RT 21, 25. A family friend offered Hudson full-time employment working from home as an information technology assistant. RT 23-24. Hudson also was offered a volunteer position performing marketing tasks for a non-profit called Adams Avenue Business Association. RT 25, 29-30. Hudson planned to use services offered by Beit T'Shuva, a nonprofit organization providing services to Jewish criminal offenders. RT 27-28. Beit T'Shuva services include a 12-step-program, emotional and spiritual counseling, vocational services, and community volunteer work. RT 31. Hudson planned to participate regularly in Alcoholics Anonymous meetings. RT 28.

Psychological Evaluation: Hudson's most recent psychiatric evaluation is supportive of release.

> If released to the community, his violence potential is estimated to be no more than the average citizen in the community. The only risk factor which would be a precursor to violence for this inmate would be a return to substance abuse. However, he has been successful in avoiding any temptations to abuse substances while in prison.

Resp. Exh. 1 at Exh. C, 12/31/02 mental health evaluation, p. 5.

### b. BPH's Decision And State Court Review

At Hudson's hearing, the BPH panel found Hudson "not suitable for parole." RT 73. The BPH found that the commitment offense was especially cruel and callous in that Hudson and his co-defendant beat the victim to death with a metal pipe until the victim's skull split open and dumped the victim's body in a lake. RT 73-75. The BPH also found that the crime was in the course of a robbery and that the motive for the crime was trivial in relation to the murder, in that it involved a transaction regarding narcotics. RT 74. In addition, the BPH relied on Hudson's prior criminality. RT 75. That criminality included five drug-related arrests and Hudson's admission that he had been involved in smuggling cocaine from South America and in setting up a marijuana farm in California. *Id*. The BPH also noted in its decision that prior to his commitment offense, Hudson suffered from alcohol and marijuana addictions and used cocaine and LSD. *Id*. Further, the BPH emphasized that at the time of the offense Hudson was 28 years old and by that time he had not benefitted from society's attempt to reform him through a drug diversion program. *Id*. The BPH noted that Hudson has "very good" parole plans to reside with

1  his parents, work, and volunteer. RT 79. The BPH found that Hudson needs to continue his
2  participation in self-help and therapy programs because "the opinion of this Panel [is] that
3  [Hudson's] expressions of remorse are less than sincere . . . superficial, they exhibit little feeling,
4  and they are scripted." RT 79-80. The commissioner believed that until Hudson progresses in
5  his sincerity he will continue to be a threat to others, RT 80, although several mental health
6  evaluators thought he was remorseful.[1]

7  The Los Angeles County Superior Court upheld the BPH's decision in a reasoned
8  decision. Resp. Exh. 2. As the last reasoned decision from a state court, that is the decision to
9  which § 2254(d) applies. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v.*
10 *Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court found that some evidence
11 did support the BPH's conclusion that Hudson was not suitable for parole based on the
12 applicable factors. Resp. Exh. 2 at 1. The court articulated that "[b]ecause this crime involved
13 severe trauma to the helpless victim, it shows an exceptionally callous disregard for human
14 suffering" within the meaning of the California Code of Regulations, title 15, section 2402
15 (c)(1)(d). *Id.* at 2. The superior court also agreed with the BPH's finding that the motive for the
16 murder, to obtain money, is "materially less significant than those which conventionally drive
17 people to commit murder." *Id.* The superior court relied solely on the facts surrounding the
18 commitment offense to deny the habeas petition.

           c.     <u>Analysis Of Parole Habeas Claim</u>

21 The state superior court determined that the BPH relied on *only* the commitment offense
22 in finding Hudson unsuitable for parole. This was an error by the superior court because the
23 BPH hearing transcript shows that the BPH relied also on Hudson's pre-commitment criminality
24 and unstable social history (i.e., the drug abuse). *See* RT 75. The superior court's error does
25 not aid Hudson because the writ would not be granted as a bonus for a mistake by a state court

---

[1] In 1985, the examining psychologist acknowledged that Hudson felt that his co-defendant was responsible for the murder, but his subsequent psychological evaluations from 1990, 1998, 2000, 2001, and 2002 stated that Hudson expressed remorse for the crime. Resp. Exh. 1 at Exh. C1-C8.

on collateral review but instead only would be granted if there was a constitutional violation. The constitutional right as described by *Hayward* and its progeny is the right to be paroled absent some evidence of current dangerousness, and is not the right to be paroled absent a correct state court decision.

For habeas relief to be granted in this case, there would have to be less than "some evidence" to support the BPH's factual findings as to the central issue of current dangerousness. The BPH's decision has the necessary support in Hudson's case.

The BPH determined that Hudson carried out the commitment offense in an "especially cruel, callous, heinous, atrocious manner", that the motive for the crime was trivial in relation to the crime, that Hudson had a 10-year pre-incarceration history of criminality involving narcotics, and that at 28 years old Hudson had failed to benefit from society's attempts to correct his criminal behavior. There was some evidence to support each of those findings. The circumstances were probative of, and provided reliable evidence of, Hudson's current dangerousness. Even though Hudson's narcotics offenses and addictions occurred more than two decades ago, the psychologist left open the possibility that a drug relapse could cause Hudson to be dangerous to society. The combination of the commitment offense, prior drug related arrests, cocaine smuggling, and marijuana farming activities had a sufficient nexus to the ultimate determination of current dangerousness. Hudson's educational achievements, employment prospects, in-prison behavior, extensive self-help, family and religious support, volunteer efforts, and therapy programming count in Hudson's favor, but they do not compel a finding of suitability. The information available to the BPH reasonably indicated "that the implications regarding the prisoner's dangerousness that derive from his … commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." *Lawrence*, 44 Cal. 4th at 1214. The record contains evidence that this was an unusually brutal murder, and was committed by someone who was not just a user of drugs but someone who was much deeper into the business of drugs. There was some evidence to support the BPH's findings on the commitment offense and prior criminality, and those circumstances were probative of and provided reliable evidence of Hudson's current dangerousness 21 actual

years into his sentence. Hudson therefore is not entitled to federal habeas relief.

B.     Breach Of Plea Agreement Claim

     1.     Federal Law Standards For Plea Agreements

Plea agreements are contractual in nature and subject to contract law standards of interpretation. *Ellis v. District Court*, 356 F.3d 1198, 1207 (9th Cir. 2004). Further, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971); *cf. Mabry v. Johnson,* 467 U.S. 504, 509 (1984). A party breaches a plea bargain if it fails to live up to the promises it made under the agreement. *See Buckley v. Terhune*, 441 F.3d 688, 698 (9th Cir. 2006) (en banc); *Brown v. Poole,* 337 F.3d 1155, 1159-61(9th Cir. 2003).

     2.     Analysis of Breach of Plea Agreement Claim

Hudson's claim that his plea agreement was breached has no merit. Although a criminal defendant has a due process right to enforce the terms of a plea agreement, *see Santobello*, 404 U.S. at 261-62, the record does not show that any term was breached. Hudson argues in his petition that his plea agreement was breached because he pled guilty only to first degree murder, yet the BPH relied at least in part on the dismissed robbery charge and the dropped special circumstances charge in reaching its decision that Hudson was not suitable for parole. Petition, p. 20. Hudson relies on *People v. Jerome* for the proposition that "when the prosecutor fails to charge different statements of the same offense, the defendant can be convicted by his plea only of the crime as it is actually pled." *Id.* (citing 160 Cal. App. 3d 1087, 1096 (1984)). However, Hudson fails to acknowledge that denial of parole is not a conviction as was the case in *Jerome*. In addition, Hudson faces the hurdle that the statutory maximum for his crime is life imprisonment, and Hudson agreed to that sentence in his plea agreement. Resp. Exh. 3 at Exh. G, 1/14/84 Los Angeles Superior Court sentencing transcript, p. 4. Neither the BPH nor the state court caused Hudson's sentence to extend beyond the life maximum to which he agreed.

Further, Hudson does not demonstrate that his plea agreement precluded future parole boards from using evidence of the circumstances of his commitment offense to determine parole suitability. The BPH may consider all relevant and reliable information available to it including "the base and other commitment offenses, including behavior before, during and after the crime." 15 Cal. Code Regs. § 2402(b). In sum, Hudson's plea agreement was not breached.

C.   Certificate Of Appealability

A certificate of appealability will issue as to the due process claim of insufficient evidence. See 28 U.S.C. § 2253(c). Jurists of reason could disagree with this court's conclusion that there was some evidence to support the BPH's denial of parole. A certificate of appealability will not issue as to the breach of plea agreement claim because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**CONCLUSION**

The petition for writ of habeas corpus is denied. The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: October 4, 2010

SUSAN ILLSTON
United States District Judge